854 So.2d 98 (2003)
R.O.M.
v.
B.B.
2010632.
Court of Civil Appeals of Alabama.
January 10, 2003.
*99 Blake A. Payne, Jasper, for appellant.
Samuel B. Bentley, Jasper, for appellee.
PITTMAN, Judge.
R.O.M. ("the father") previously appealed a summary judgment of the Walker juvenile court in R.O.M.'s paternity action, declining to declare that he was the father of W.K.D.J. ("the child"). See R.O.M. v. T.W.J., 768 So.2d 397 (Ala.Civ.App.2000) ("R.O.M. I"). The facts in R.O.M. I indicate that the child was born in May 1995. The father testified he first learned of the existence of the child sometime in 1997, when the child was two years old. Following this discovery, the father arranged to *100 have a DNA test performed in the fall of 1997. The results of that test were inconclusive, and the father subsequently took a second test, which indicated that he was the child's father.
In January 1998 the father petitioned for custody, or in the alternative, for visitation rights as to the child and sought a judgment declaring that he was the father of the child. The juvenile court entered a summary judgment against the father and in favor of the mother's ex-husband and B.B. ("the grandmother"), the maternal grandmother and temporary custodian of the child.[1] This court reversed the summary judgment and remanded the case. On remand, on June 20, 2000, the juvenile court entered an order declaring R.O.M. to be the father of the child, thus enabling him to pursue his parental rights. The juvenile court set a hearing for August 29, 2000, on the issues of child support, custody, and visitation.
On August 18, 2000, the father filed a motion for immediate visitation pending the custody hearing, arguing that he was being denied visitation by the grandmother. On September 15, 2000, the juvenile court granted the motion and awarded the father visitation every other weekend from 5:00 p.m. on Friday until 5:00 p.m. on Sunday. The August 29, 2000, hearing was continued, and the juvenile court began hearing testimony on October 16, 2000. During the course of the hearing the juvenile court learned that the mother had not been served with notice of the hearing, nor was she represented by counsel. The juvenile court recessed the hearing until the mother could be served and requested that the attorneys agree on a final hearing date.
In May 2001 the father filed a motion to set the cause for a final hearing; the juvenile court set a hearing for August 16, 2001. In July 2001 the father began paying child support in the amount of $50 per week pursuant to a court order. After several delays during which time the mother could not be located, the juvenile court held a "final" hearing on November 20, 2001. Both the grandmother and the father requested custody of the child. The juvenile court received ore tenus evidence and conducted an in camera examination of the child.
Before the juvenile court entered the summary judgment for the grandmother, the father was allowed visitation with the child (during 1998 and 1999), but he lost his visitation rights during the appeal of R.O.M. I and only regained visitation rights again in September 2000. Both the father and his wife testified that the child enjoyed his visits and that the father and the child were developing a strong relationship. The father and his wife also testified that the grandmother told them she would leave the country with the child if she lost custody and showed them passports she had for herself and the child. The grandmother alleged that the father had abused the child; the father denied ever hitting the child.
The grandmother's testimony at the November 20, 2001, hearing verified that she had taken physical custody of the child when her daughter, the mother, voluntarily relinquished custody in 1997. The grandmother gave extensive testimony regarding bruises she discovered from time to time on the child and offered some photographs as evidence. She stated that she had not reported those incidents of alleged abuse to the authorities except in passing. During cross-examination, the grandmother revealed that the photographs *101 showing bruises were taken during July and August 2000, months when the father's visitation rights were suspended. At the close of the hearing the court did not issue an order.
On February 26, 2002, the juvenile court held another hearing at which it heard no testimony, only argument from the parties' counsel. No record of that hearing exists, other than a mention of that proceeding in the juvenile court's final order. On February 28, 2002, the juvenile court issued an order addressing custody, visitation, and child support. This order awarded custody of the child to the maternal grandmother and set a visitation schedule for the father. The order also reaffirmed the earlier child-support order. The father filed a postjudgment motion, which the juvenile court denied on March 8, 2002. This timely appeal follows.
The father argues that the juvenile court abused its discretion by awarding custody of the child to the grandmother rather than to him. He attacks the juvenile court's order in two specific ways. First, the father argues that the juvenile court erred in awarding custody to a nonparent without making a finding that he, as the natural parent, is unfit. Second, the father argues that the juvenile court must have applied the wrong standard when it awarded custody of the child to a nonparent over the natural father.
"`[O]ur standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of a trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown.'"
Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994)(quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)) (citations omitted).
"In a custody dispute between a parent and a nonparent, the parent has a prima facie right to custody of his or her child. Ex parte D.J., 645 So.2d 303 (Ala.1994). Unless the trial court finds that the parent is unfit, or that the parent has voluntarily relinquished custody of the child, or that the parent has lost custody of the child by virtue of a prior order, the law presumes that the best interests of the child will be served by giving the parent custody. Ex parte Terry, 494 So.2d 628 (Ala.1986); Ex parte Mathews, 428 So.2d 58 (Ala.1983); E.C.B. v. J.S., 612 So.2d 1243 (Ala.Civ. App.1992); Roden v. Colburn, 522 So.2d 290 (Ala.Civ.App.1988)."
D.P.M. v. D.B., 669 So.2d 191, 193 (Ala. Civ.App.1995).
In this case, the juvenile court did not expressly find the father unfit. See C.P. v. W.M., 806 So.2d 395 (Ala.Civ.App.2001). In fact, the juvenile court made no written findings of fact at all. Absent a finding of unfitness, unless the father voluntarily relinquished custody or lost custody of the child by virtue of a prior order the presumption that it is in the best interests of the child for the father to have custody is not overcome. Under the standard expressed in Ex parte Terry, 494 So.2d 628 (Ala.1986), the natural parent has a prima facie right to custody as to a nonparent, in this case the grandmother. Because no prior custody order is in the record, the only remaining ground by which the juvenile court could award custody to the grandmother over the father is voluntary relinquishment.
This court recently reviewed the issue of voluntary relinquishment in R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002). *102 Citing Ex parte McLendon, 455 So.2d 863 (Ala.1984), this court noted that a parent who voluntarily relinquished custody and "whose relinquishment has been acted upon by another to the manifest interest and welfare of the child," loses his presumption of right to custody and must meet the McLendon standard to regain custody of his or her child. R.K. v. R.J., 843 So.2d at 778. That standard imposes a duty on the party seeking custody to prove that the transfer of custody will materially promote the interest and welfare of the child and will outweigh the inherently disruptive effect of the transfer. Ex parte McLendon, 455 So.2d at 865. Of the evidence offered in the hearings that might support a finding of voluntary relinquishment, the only undisputed fact gleaned is that the father did not begin paying child support until he was ordered to do so in July 2001. The father in this case initially began the process to adjudicate paternity and to assert visitation in 1998. See R.O.M. I. The primary difficulty is that the process of adjudicating the father's legal rights has taken nearly five years and during that time the child has lived with the grandmother.
Indeed, the record is clear that once the DNA test results were verified by the second test performed in 1998, the natural father consistently pursued an active relationship with the child. The fact that the father's attempt to pursue his parental rights was delayed by the judicial process does not support a finding of voluntary abandonment. We cannot find sufficient evidence in the record to support a voluntary relinquishment of custody by the father.
Usually in cases where the juvenile court has made no findings of fact, this court assumes that the juvenile court made those findings necessary to support its judgment. See Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997). However, a thorough review of the record reveals numerous conflicting statements by the father and the grandmother; those conflicting statements cast doubt on the juvenile court's custody determination.
The father denied any knowledge of the child's existence until sometime after the child turned two years old. The grandmother stated that the daughter told her that R.O.M. was the child's father, although at the time of the child's birth the daughter was married to another man. The grandmother accused the father of bruising the child during scheduled visitation, but she admitted she never alerted the authorities to the alleged abuse. The father stated that the grandmother had threatened to run away with the child if she lost custody. We note that this court may not substitute its judgment for that of the trial court. Bratton v. Romine, 819 So.2d 58, 61-62 (Ala.Civ.App.2001). However, after a careful review of the record, this court cannot determine which standard the juvenile court applied when it awarded custody to the grandmother.
In light of the conflicting evidence contained in the record, as well as the fact that the juvenile court did not make any written findings of fact regarding the fitness of the father, we conclude the trial court abused its discretion by awarding custody of the child to the grandmother. We cannot determine whether the trial court applied Ex parte Terry, supra, or Ex parte McLendon, supra, in making the custody award determination. Therefore, we must reverse the juvenile court's judgment and remand the cause for the juvenile court to make the necessary express findings of fact, to apply the proper standard, Ex parte Terry, and to make a child-custody award based upon the correct standard.
*103 REVERSED AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and THOMPSON, J., concur.
CRAWLEY and MURDOCK, JJ., concur in the result.
CRAWLEY, Judge, concurring in the result.
I agree that this case must be remanded for the trial court to make an express finding as to whether the father is unfit based on the evidence of record. See J.L. v. L.M., 805 So.2d 729, 733 (Ala.Civ.App. 2001); R.H.M. v. State Dep't of Human Res., 648 So.2d 614, 616 (Ala.Civ.App. 1994). In addition, I note that the majority's conclusion on the issue of voluntary relinquishment is further supported by our supreme court's decision in Ex parte D.J., 645 So.2d 303 (Ala.1994).
MURDOCK, Judge, concurring in the result.
The testimony in this case is often confusing and, as the majority notes, there are numerous inconsistencies in it. Nonetheless, among the testimony presented to the trial court that could be pertinent to the issues of "unfitness" and/or "voluntary relinquishment" is the following.
The grandmother, B.B., testified that she learned at the time her daughter became pregnant that R.O.M. might be the father of the child. W.K.D.J. ("the child") was born in May 1995 and three months after his birth the grandmother began keeping the child. The father testified that he suspected in May 1996 that the child was his son.[2] About a year and one-half after the child was born, according to the grandmother, the child's mother spent two weeks with R.O.M. and advised him that the child was his. Consistent with this testimony, B.B. also testified that R.O.M.'s visitation with the child began, through her informal consent, in January or February 1997, or about the time the child's mother advised R.O.M. of his paternity. B.B. further testified that it was approximately two years later before a DNA test was performed. She stated that R.O.M. failed to appear for an earlier paternity test that had been scheduled and that a court order was required to force him to present himself for a second scheduled paternity test. B.B. further testified that, although the father was adjudged on June 20, 2000, to be the father of the child, during the time she has had custody of the child, the father never paid any child support until he was ordered by the court to do so in July 2001. B.B. also testified that R.O.M. knew how the child's mother had mistreated the child, but he had not intervened or offered any assistance.
The father gives a slightly different version of events, including that he was first told of his paternity of the child approximately two years after the child's birth. However, it was more than two years and seven months after the child's birth before the father petitioned for custody and a paternity declaration in January 1998. Thus, even if the trial court believed the father's testimony that he did not know that he was the child's father until two years after the child's birth, the court still could have inferred from that testimony that the father failed to assert his rights for approximately seven months after he was told he was the father of the child. There is also testimony from which the court could have inferred that the father *104 never sent the child any birthday or Christmas presents.
B.B. testified that when she would take the child to meet R.O.M. for weekend visits, the child often would go "kicking and screaming" and did not want to visit with R.O.M. B.B. stated that R.O.M. would be forced to "pick [the child] up bodily and put him in the vehicle to take him." She testified that she observed bruises on the child following some visits, including bruises on one occasion to the child's stomach, which, according to B.B., the child told her occurred because "[R.O.M.] was mad and pushed him down." Other bruises occurred, according to B.B.'s recollection of her conversation with the child, from R.O.M.'s pushing the child down stairs. Among other things, both photographic and testimonial evidence was introduced of the existence on different occasions of bruises on the child's face, on the upper inside area of his left leg, and on his buttocks. B.B. also testified, without objection, that the child told her that a bruise he once suffered under his right eye occurred because "R.O.M. had got mad at him because he wanted his Daddy[, T.J., the mother's ex-husband to whom she was married when the child was born]." In addition, there were conflicts in the testimony of both R.O.M. and his wife from which the trial court could have made adverse credibility determinations, including conflicts as to whether the child always called R.O.M. "Daddy" or whether the child called him by his first name on some occasions, and whether the child cried while visiting with R.O.M. (I note that in the transcript of the in camera testimony of the child during the trial, the child, without exception, referred to R.O.M. using his first name.)
There was evidence indicating that B.B. cared for and loved the child and had provided a stable home for him for most of his life as if he were her own child. R.O.M. admitted that B.B. had a "loving and caring relationship" with the child and that he knew that there would be some "harm or anguish or upset" on the part of the child if he were taken from B.B.:
"Q. Does [B.B.] appear to love the child?
"A. Yeah.
"Q. Do they appear to have a loving and caring relationship?
"A. Yes, sir.
"Q. Have you ever thought about what harm or anguish or upset might happen to this child if he were taken from this environment to live with you?
"A. Yes, I've thought about it.
"Q. You know there will be some, don't you?
"A. Oh, yes.
"Q. A child would think it would be terrible, right?
"A. Oh, yes, but you know, me and him has talked about it and I want to be able to have my chance."
R.O.M. further testified that he thought the child attended "Valley Junior High," but that he had never visited him in school or had any conferences with his teachers.
B.B. also testified without objection that R.O.M.'s wife had called the child "a son of a b...." on one occasion when he opened a door too wide and hit some furniture, and that there were other instances of this nature involving R.O.M.'s wife. B.B. testified that the child "looks [to] me to protect him."
Among other things, the child testified in camera as follows:
"THE COURT: Okay. Do you know what we're doing here today?
"[CHILD]: Yeah, child support and I don't like it.

*105 "THE COURT: You don't like child support? Why?
"[THE CHILD]: Because I don't like [R.O.M.] Do you know what he does to me?
"THE COURT: Nuh-uh.
"[THE CHILD]: He just beats me, mean, mean, mean."
The child also testified that R.O.M.'s wife had a bad temper and that on one occasion she beat him to the point that he, R.O.M., started crying. The child also testified that R.O.M. and his wife have another man, named Danny, a "friend" who lives with them. The child also testified as follows:
"[THE CHILD]: ... And [R.O.M.] bustedsee that right there?
"THE COURT: Uh-huh.
"[THE CHILD]: That's where he busted my lip.
"THE COURT: How did he do that?
"[THE CHILD]: Just slapped me, it was bleeding, it was coming out of my mouth.
"THE COURT: Did he slap you because he was mad at you or was it an accident?
"[THE CHILD]: Mad at me....
"....
"[THE CHILD]: ... I hate [R.O.M.] Do you know he does a lot mad...."
The child also stated on the record that he wanted to live with B.B.
In addition, I note that B.B. played for the court several audiotape recordings of the child's conversations with her and his reactions to going to visit with R.O.M. These tapes were made in a car on the way to the visits. It is well established that we assume that missing parts of the record support the trial court's judgment. Leverett v. Leverett, 828 So.2d 320 (Ala. Civ.App.2002) (citing Eagle Bail Bond v. State, 757 So.2d 433, 436 (Ala.Civ.App. 1999)).
The majority opinion states that the "only undisputed fact" that might support a finding of voluntary relinquishment of the child is the fact that the father failed to pay child support. I agree that this may be the only undisputed fact regarding a possible relinquishment, but it may not be the only fact which the trial court could discern from the evidence. Nonetheless, as we recently noted in R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002), this court is bound by the holding of our Supreme Court in Ex parte D.J., 645 So.2d 303 (Ala.1994). Ex parte D.J. stands for the proposition that if the issue in a custody case is whether a parent has voluntarily relinquished that custody, a trial court may not consider evidence of the parent's actual physical or psychological abandonment of the child that occurs before the parent is legally declared by a court to be the parent. See R.K., supra. Accordingly, I would have to agree that the holding in Ex parte D.J. would not tend to be supportive of a finding of voluntary relinquishment in the present case.
As to the issue of unfitness, it was the trial court's responsibility in the ore tenus hearing in this case to sort through conflicting testimony, make credibility determinations, weigh the testimony, and draw such inferences and make such findings as necessary to resolve conflicts in the testimony.
"`Our standard of review is very limited.... A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the *106 trial court would be to reweigh the evidence. This Alabama law does not allow.'"
Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994) (citations omitted) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ. App.1993)). Further, where a trial court has made no express findings of fact, this court normally will assume that the trial court made those findings necessary to support its judgment. See Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997). Judge Crawley is correct, however, to the extent he notes in his special writing in this case, that this court has held that, before a trial court may choose a nonparent over a parent in a custody dispute where the issue is the parent's alleged unfitness, the court must make an express finding that the parent is unfit. See, e.g., J.L. v. L.M., 805 So.2d 729, 733 (Ala.Civ. App.2001). Because the trial court did not do this in the present case, I agree that the cause must be remanded.
NOTES
[1] The mother's ex-husband, to whom she was married when the child was born, was the presumed father. He is not a party to this appeal.
[2] At another point in his testimony, the father testified with respect to the child that "they kept him from me for two years."